City of Chicago v. Gathman.

## City of Chicago v. Ludwig A. D. Gathman.

### Gen. No. 13,688.

1. PLEADING—*how declaration construed after discontinuance as to one defendant.* A declaration is to be read as applying only to the defendants remaining after the discontinuance thereof as to one of the original defendants.

2. RES JUDICATA—*when fellow-servant question is.* The question as to who are fellow-servants, as a matter of law, is *res judicata* upon a second appeal, where it is presented upon substantially the same evidence as was contained in the record upon the first appeal, in which it was held that the question of fellow-servants was one of fact for the jury.

3. MASTER AND SERVANT—*what not within doctrine of assumed risk.* *Held,* that a person working beneath a bridge did not assume the risk that the bridge at which he was employed would be raised without signal from him, where the employee, who caused such bridge to be raised without such signal, had specifically agreed not so to do.

4. MASTER AND SERVANT—*test as to existence of relation of.* The real test by which to determine whether a person is acting as the

servant of another is to ascertain whether at the time when the injury was inflicted he was subject to such person's orders and control and was liable to be discharged by him for disobedience to orders or misconduct.

5. BRIDGES—*duty of city with respect to.* Where a bridge is a part of the street, a city owes the same duty in respect thereto that it does to other parts of such street. Likewise, the city having the exclusive management, control and operation of such bridge is bound to exercise ordinary care in its operation and to reasonably operate it so as to avoid injury to persons and property. This duty is a primary one, of which the city cannot divest itself so as to avoid liability for negligence in its operation and consequent injury.

Action in case for personal injuries. Appeal from the Circuit Court of Cook County; the Hon. PAUL MCWILLIAMS, Judge, presiding. Heard in this court at the March term, 1907. Affirmed. Opinion filed March 9, 1908.

**Statement by the Court.** This is an appeal from a judgment for $5,000 rendered in a suit by appellee against appellant and James O'Connor. The declaration contains only one count, in which it is averred, in substance, as follows: The city of Chicago owned and controlled Van Buren street bridge in said city, and appointed James O'Connor bridge tender thereof. Plaintiff was employed by the said city as a machinist, and, to-wit, January 10, 1901, was by said city ordered to perform certain work and make certain measurements on and beneath said bridge; and while plaintiff was performing said work beneath said bridge, and exercising reasonable care, said defendants negligently set in motion the machinery of the bridge, and by reason thereof plaintiff was caught between two heavy pieces of iron, and was greatly and permanently injured, etc.

Each of the defendants pleaded the general issue. Subsequently the cause was discontinued, on appellee's motion, as to O'Connor. The jury found the appellant guilty and assessed appellee's damages at the sum of $5,000, and judgment was rendered on the verdict.

Appellee, at the time of his injury, had been in the employ of the city for a number of years, in the bridge department, a subordinate department of the department of pub-

lic works of the city. A Mr. Willman had immediate charge of the bridge department under Patrick White, the superintendent of bridges, and had authority to give directions to appellee. January 10, 1901, Mr. Willman directed appellee to go to the Van Buren street bridge and take a measurement of the stroke of the arm of the heel lock, when the bridge was stationary, and then the bridge tender would raise the bridge for him to take another measurement, so as to get the full stroke of the arm. The evidence tends to prove that in order to ascertain the full stroke of the arm, it was necessary to take one measurement when the bridge was stationary and another when it was raised. Van Buren street lies east and west, and the bridge in question is across the Chicago river on the line of Van Buren street, and connects the part of the street east of the river with the part west of it, so that when it is closed it is a part of the street. The bridge is a rolling lift bridge, and is operated by machinery moved by electrical power. The machinery which operates the east part of the bridge is under the street on the east side, and that operating the west part under the street on the west side. The parts of the bridge each side of the center are operated separately by separate machinery, and each part requires a man to operate it, so that the operation of the bridge requires at least two men. There is a shanty at the southeast corner and another at the northwest corner of the bridge, in which are situated the appliances to turn on and regulate the power which moves the bridge machinery. When either part of the bridge is raised, the end next the approach to the bridge goes up. To take measurements as directed, it was necessary for appellee to go beneath the part of the bridge which lay east of the center when the bridge was closed or stationary. James O'Connor was the bridge tender at the time of the accident, having been regularly appointed as such by the mayor of the city, with the concurrence of the city council. The actual work of operating the bridge was done by James O'Brien, who operated the part of it east of the center, and by James McDonald, who operated that part of it west of

the center. These men were not employed or paid by the city, but were hired and paid by James O'Connor, the bridge tender. Patrick White, superintendent of bridges, testified that he "had authority, if he saw a man operating a bridge improperly, to discharge him or make him leave that work; that it made no difference who he was, if he was doing something wrong, he could discharge him immediately." Appellee testified that after he was directed by Willman, as above stated, he went to the bridge and into the bridge house on the east side, and told O'Brien that he was sent there to take a measurement; that he would take one measurement first, and then would signal him, O'Brien, that he had taken that measurement, and for him to lift the bridge, and then he would take the other; and when through would signal him to lower the bridge, and O'Brien said "it was all right." Appellee further testified that after the conversation above mentioned, and four or five minutes before he went beneath the bridge, he went to the west side of the bridge and talked with McDonald, and then went back to the east side and repeated to O'Brien what he had said to him before. McDonald, who operated the west side of the bridge, testified that plaintiff came to him about ten o'clock and said he wanted to take some measurements, and would want the bridge raised, and witness told him to notify the operator on the other side, and plaintiff said he would do so and give that operator the signal when he was ready, and the arrangement was that plaintiff and his helper, James Burke, were to notify the operator on the east side of the bridge, when they were ready to have that side raised, and that four or five minutes after plaintiff went underneath the bridge, witness was signaled from the east side to raise the bridge; that it was necessary for witness to raise his part of the bridge five feet to unlock the bridge, so as to allow the east half to be raised. It appears from the evidence that James J. Kennedy, a common laborer, who had been employed occasionally by McDonald and O'Brien to assist them, and paid by whichever of them employed him, was on the bridge at the time in question. He testified that he

City of Chicago v. Gathman.

was in the shanty at the east end of the bridge when plaintiff was on his way below, and that O'Brien, who was shoveling snow at the time, told witness to get ready to make a lift, to go ahead and make the lift, that plaintiff wanted to make some measurements, and witness signaled to McDonald, who signaled back that he was ready, and rang the bell to clear the bridge, and started to raise his end, when the west side went up several feet, and witness turned on the current and started to raise the east end, when he heard a voice, "Stop, for God's sake, stop," and witness shut off the current.    He also testified that before he made the lift he received no signal from below.    While plaintiff was underneath the floor of the bridge, with James Burke, his helper, and engaged in making the first measurement of the arm of the heel lock, the power was turned on, the machinery set in motion and the east half of the bridge raised, without any signal from either him or Burke.    The consequence was that appellee was caught and crushed between the moving arm of the heel lock and an iron column and was seriously and, as the evidence tends to prove, permanently injured.

JAMES H. LEWIS and JOHN R. CAVERLY, for appellant; CHARLES B. STAFFORD, of counsel.

CHARLES J. TRAINOR, for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

Appellant's counsel contend that inasmuch as it is averred in the declaration that James O'Connor was in the employ of appellant, as bridge tender, to have charge of the machinery and operation thereof, and to raise and lower the bridge, it was incumbent on appellee to prove that O'Connor was actually operating the bridge at the time of the accident, and was guilty of negligence.    While we do not think this follows, we think the evidence is sufficient to show negligence of O'Connor.    It was clearly his duty, as the regularly appointed bridge tender, to use ordinary care to so operate the bridge as not to injure appellee, the latter be-

ing in the discharge of his duty and in the exercise of care
for his personal safety.   O'Connor's duty required that he
should either assist in the operation of the bridge, or at least
supervise its operation.   It is apparent from the evidence
that he was not on or at the bridge at the time of the ac-
cident.   Whether he ever assisted in or supervised the opera-
tion of the bridge does not appear from the evidence.   Mc-
Donald and O'Brien, whom O'Connor hired to actually
operate the bridge, were mere instrumentalities used by him
for that purpose, and O'Brien's negligence was his negligence.

The case having been discontinued as to O'Connor, the
declaration is to be read as charging negligence against ap-
pellant only.

Appellant's second contention is, that O'Connor or O'Brien
or Kennedy, or whoever was operating the bridge, and the ap-
pellee, were fellow servants.   In Gatham v. City of Chicago,
127 Ill. App., 150, which was an appeal from a former judg-
ment in the cause, the question was presented whether Kenne-
dy, who was operating the bridge under the direction of
O'Brien, was a fellow-servant of appellee, and we held, Mr.
Justice Brown delivering the opinion, that it could not be
held, as matter of law, that they were fellow-servants; but that
the question whether or not they were such was for the jury
to find from the evidence.   The evidence bearing on that
question was substantially the same on that appeal as in the
record now before us.   Therefore, the question is *res adjudi-
cata* in this court.   Geiman v. Town of Browning, 87 Ill.
App., 418; Newberry v. Blatchford, 106 Ill., 584; 591–2, and
cases cited.   On the last trial the question whether appellee
and O'Brien were fellow-servants was submitted to the jury
by instructions given at appellant's request, and the jury, by
their verdict, found that they were not.   We concur in that
finding.

It is next contended by appellant's counsel that appellee
assumed the risk.   It is uncontroverted that appellee, be-
fore he went below the bridge, told O'Brien that he was sent
to make a measurement, and that he would take one first,
and when he would have done so, he would give to him,

City of Chicago v. Gathman.

O'Brien, a signal to lift the bridge, and another to lower it when he, appellee, would be through, and that O'Brien agreed to that arrangement.  Appellee knew that the place in which it was necessary for him to be, to take the first measurement, would be safe while the bridge remained stationary; but if the bridge should be raised and the machinery thereof set in motion, it would be a dangerous place in which to be.  He was unwilling to assume the risk of this danger, and by his arrangement with O'Brien did all in his power to avoid the risk.  Therefore, the proposition of counsel is, that appellee assumed the risk of O'Brien raising the bridge without any signal from him, which O'Brien had specifically agreed not to do.  We regard the proposition as a good illustration of the quintessence of nonsense.

Excluding the hypothesis that appellee and the operator of the east half of the bridge were fellow-servants, and the hypothesis that appellee assumed the risk, it is not argued or claimed that the appellant is not liable.  Therefore we might, in accordance with the well-settled rule that matters not argued are waived, omit, in this opinion, further consideration of the question of appellant's liability.  But the question being an important one, we will briefly consider it. What is appellant's duty in respect to the bridge in question?  Van Buren street bridge is a part of the street, and the city owes the same duty in respect to it that it does to other parts of Van Buren street.  2 Dillon on Mun. Corp., 4th ed., p. 881, section 728; City of Chicago v. Powers, 42 Ill., 169; City of Chicago v. McGinn, 51 *ib.,* 266; Pres't & Trustees, etc., v. Meredith, 54 Ill., 84; Gavin v. City of Chicago, 97 *ib.,* 66, 70; City of Chicago v. McDonald, 57 Ill. App., 250, and cases cited.  That duty is to exercise ordinary care to maintain the bridge in a reasonably safe condition for public travel.  But manifestly there is an additional duty in the case of a movable bridge such as the one in question.  The city has the exclusive control, management and operation of the Van Buren street bridge, and it is incumbent on it to exercise ordinary care in the opera-

tion of the bridge, to reasonably operate it so as to avoid injury to persons and property. And if one, without fault on his part, is injured by reason of the city's negligence in the operation of the bridge, we think it necessarily follows that the city is liable. Suppose that while persons and teams were on the bridge and others approaching it for the purpose of passing over it, that the city, without warning, as by ringing a bell or otherwise, should suddenly and unexpectedly raise the bridge, carrying up persons thereon, and in consequence thereof some of such persons should be injured, without fault on their part; can it be doubted that the city would be liable? In the present case there was not only the absence of any warning to appellee, but an express agreement that the bridge would not be raised without a signal from him, and he gave no signal. The duty of the city to exercise ordinary care in the operation of the bridge is a primary duty, of which it cannot divest itself so as to avoid liability for negligence in its operation and consequent injury. Kreigh v. City of Chicago, 86 Ill., 407. The action was properly brought against the city. Tift v. Towns, 53 Ga., 47.

Lastly, counsel contend that each of the instructions 2, 3, 5, 6 and 7, given at appellee's request, is erroneous. Instruction 2 is as follows:

"If the jury believe from the evidence in this case that one O'Connor was the bridge tender for the bridge in question, regularly appointed as such by the defendant, city of Chicago; that one O'Brien was appointed as assistant bridge tender of said bridge by said O'Connor in his capacity as said bridge tender, and that he, said O'Brien, was paid his wages or salary, if any, by said O'Connor; and if the jury further believe from the evidence that the city of Chicago, by its superintendent of bridges, if any, or by some of its officers, if any, other than said O'Connor, had the right to discharge said O'Brien, then the jury are instructed that said O'Brien was at the time of the accident testified to in this case a servant of the city of Chicago."

The question presented by this instruction is not free from difficulty. The evidence is that it required at least

two persons to operate the bridge, by reason of the fact that there was separate machinery for the operation of each leaf of it, and at each end a controller for letting on and regulating the power by which the machinery is moved, and the city must have known that it was necessary for O'Connor to employ at least one man, and that, in fact, he employed two, McDonald and O'Brien. Patrick White, superintendent of bridges, knew, as his testimony shows, that O'Connor employed two men to operate the bridge, and his knowledge was, in law, the city's knowledge. White testified that his duty was to see that the bridge tenders attended to their business, and that he had authority to discharge any one whom he saw operating the bridge improperly, no matter who he was. It is true that O'Brien was hired and paid by O'Connor, and that it was in O'Connor's power to discharge him, but we are not prepared to hold from that circumstance, that he was not the servant of the city, which knew of his employment, the necessity for it, impliedly acceded to it, and had the power, by its bridge superintendent, to discharge him.

In Wood's Law of Master and Servant, section 317, it is said: "The real test by which to determine whether a person is acting as the servant of another is, to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control, and was liable to be discharged by him for disobedience of orders or misconduct."

In Johnson v. Ashland Water Co., 71 Wis., 553, the plaintiff, Johnson, was employed, temporarily, by the defendant's servant in charge of its work, and while so employed was injured. *Held,* that the plaintiff was defendant's servant and was entitled to recover, citing numerous authorities. But even if O'Brien was not appellant's servant, but merely the servant of O'Connor, this would not, as we think, affect the question of appellant's liability, and the giving of the instruction is not reversible error.

We find no reversible error in any of the other instructions. Appellant's 18th instruction was properly refused,

for the reason that there is no evidence in the record on which to base it.

The judgment will be affirmed.

*Affirmed.*